Good morning, your honors. May it please the court, my name is Keith Swisher, and I represent Juan Carreno-Gutierrez, whom I'll refer to as Mr. Carreno. Could you speak a little louder? Certainly. Whom I'll refer to as Mr. Carreno. If I may, I would like to reserve a few minutes for rebuttal, and I'll try to mind the clock toward that end. A few preliminary comments, if I may, about sort of an overview of what I'll be talking about, and also what I won't be talking about, but what co-defendant's counsel will be. One, I'd like to talk about my issue one, which is insufficiency of the evidence. My client, of course, was the passenger who received, without the drugs in the car, but who received 15 years. I'm still having trouble hearing you. You need to speak much louder. Oh, certainly. Sorry, I feel like it was. It'll feel like screaming, because you're a soft-spoken person. I would be happy to speak up. And finally, I'd like to talk about issue four, which is the 404B slash 403 argument, where certain bad acts of the co-defendants were admitted in this joint trial. What I won't be talking about, absent any questions of your own, is issue three. I very much think that's a strong issue, but I would refer to the strengths of the briefs, and also Mr. Drake, who is counsel for Jose Luis Pitomoto, will be discussing issue three. I would just note in passing, with respect to issue three, that each of the cases that the government cites involve only one expert slash fact witness in that dual role. One case involves two, but it was two different subject matters. And just on that point, that we all, including juries, no better or worse at this, suffer from cognitive biases, including the reiteration effect or the reiteration bias. So the more times you hear something, in other words, the more likely you're to believe it's true. And that applies to juries and also applies to even relatively silly things, like so if we were to hear that frogs have internal wings a number of times, non-operational ones, obviously, or if we were to hear if you drive by a house in an unfamiliar neighborhood that you're necessarily engaged in counter-surveillance for drug trafficking activity, you're more likely to believe that the more times you hear it. And the other thing that I would just note and then leave it to Mr. Drake is the Freeman-Ancrum rule, which are two Ninth Circuit cases from 2007 and 2009, respectively. They were in place, you know, back in 2009, which was a year before this trial, so that there was that your rule was published to the district court that there should be some delineation between the expert and fact witness roles if they're in the same person, things like two phases and such. The other issue that I won't be talking about is issue four, or issue five, rather, which is severance. That's my last issue. It's a catch-all and remedial issue, and just to save the court's time, if you don't find significant error in my issues one through four, it would be a hard sell on issue five, particularly given that it wasn't raised again. Did your client ever make a severance request of the trial court? No. No, Judge Graber. He did not. So why isn't the issue waived? Well, there is the argument that they would. I pointed out in my opening, the government raised it in the answering brief. The circumstances, of course, changed over the course of trial to make this a bit unique case and more of the prejudice that I'm about to talk about, but you're right. At no point, though, did he make that request, even as the trial developed. I understand it. Is that correct? That's correct, Your Honor. Okay, thank you. So let's get to sufficiency. Sure. So your client apparently conducted a counter-surveillance technique known as a heat run. He admitted he was in the car. He knew there were drugs in the car. He knew it was a drug transaction. Why isn't that enough? Your Honor, the statements, if I may, if I can get to reasonable inferences once I give you everything that's absent, if that's possible. Stop me if it's not. But this is a case about a bunch of undisputed no's and not's, and my client is the weakest link, and therefore I would submit that it should not withstand direct appeal. The absences you have, cabining those statements that you referenced for one second, is no criminal history, no prior involvement with these defendants or these matters, no participation in the negotiations where the drugs were discussed. He wasn't involved at all, except as that's described. But why isn't that enough? Well, he also wasn't even involved to the extent of he didn't have any cash on him, and also he didn't have any cell phones on him. No cash, no cell phones, no planning evidence. But he's making the surveillance run. He knows there are guns in the car. He knows it's a drug transaction. And that the guns are for protection. Yeah. My question is why isn't that enough? Well, a couple of things. When he actually played any role with the case, if you know, for instance, under Ramon Rascone and other cases, if you know that a drug transaction is going to take place, you're in the wrong place, wrong time, et cetera, that's insufficient. So I would say that's not enough if you just know about the drug transaction. With respect to his participation, if you credit his statement, and I have some things to say about that, but if you do, what he actually did was at Felix's request, it was Felix's cars, Felix's weapons, he stuffed the guns under the seat once they were already pulled over. And preceding that, the drug bust had already occurred. So when he actually stepped in, if you credit the statement, is after everything had gone down and the conspiracy was necessarily averted or ended at that point. The other thing is mentioning the statements. There are four problems with the statements. One is, as I mentioned in the briefs, they're unrecorded, and tape recorders were sitting there, and the agents chose not to preserve the best evidence for the court of law. Two, they were altered, and I know you have already, but I would encourage you to look at opening brief 18 through 19 and reply brief 8 through 10. As Judge Graber, you were mentioning about the guns were there for protection. It was a passive voice statement. He never identified the actor by whom the guns were going to use. When Agent Moritz testified, and he was the lead agent and also the most important testimony about my client in this case, he said, and there's an ellipsis in there, but he said he was, my client, Juan Carreno, was going to use the weapons for protection and not to rob anyone. The third thing that I would ask about the statements, they're the subject of vouching, which is where I'll turn to in one second. And also, finally, they were in Spanish. Agent Moritz is not a certified Spanish speaker. In fact, the only certified Spanish speaker in the record is at ER 208. That's Agent Valadez, and he, according to Valadez, my client never admitted to any wrongdoing. With respect to Issue 2, the vouching, so that's the thin case you have before you. I hope you see, if you cabin off the statements for a second, you see how prejudicial they are. Not only would it be insufficient, but also the prejudice and the thinness of the case would reverberate out through Issues 2 through 5. But in particular, as I mentioned, it was the most important testimony. I think it's a clear constitutionally insufficient case absent those statements. Two, they were occasioned by a pause in the proceeding. That's at ER 165. So it let, you know, seep into the juror's mind, and for emphasis, whether it was accidental or not. It was sort of an anomaly with the exclusionary rule. Case agent Ostergaard was in there by virtue of his status as case agent. Otherwise, we don't want witnesses in commenting on what previous witnesses have said and arguably adjusting their testimony accordingly. Well, he didn't comment on the witness. He commented on the underlying events. He was asked if he remembered the events personally in the same way. Well, he, to be sure, they were both there, supposedly, in that interrogation room. Right. And so whether, you know, he could be cross-examined about whether he was there and whether he was paying attention. But he didn't really say anything other than shorthand for his own personal recollection. Well, it was premised with, Your Honor, did you hear what Agent Morris had to say? Right. And so rather than go back through the same, you know, 48 questions, he said, do you remember it, do you personally remember it in the same way or differently? Right. You heard the testimony, and as you said, do you remember it in the same way or differently? And he said, yes, it's absolutely correct. That's the way, in short, I remember it. But that's a shorthand description of his own recollection, isn't it? Right. And that's accurate, but it's also necessarily vouching and bolstering the testimony of Agent Morris. Any more so than if they had given identical testimony just in response to the exact same questions? Same ten questions, same ten answers? Yeah, it would be. Why is that different? We don't know if he would have, but if he would have, it would be different because now we have Agent Morris with essentially double credibility. And, by the way, they were both referred to as experts here, too, so you heard the expert, you know, refer to the testimony. And so I would say it was different at least in that way, Your Honor. There was even Judge Snow, if you look at SCR 243, he had already sustained an objection at ER 126, 127 to this type of technique where the government asks one official expert agent to comment on the testimony of another official expert slash fact witness, right? And then at SR 243 he actually suggests to the government a better way to phrase the statement, which was, as Judge Graber mentioned, essentially just ask directly what they perceived. Right. But it's a little bit different from the traditional vouching when the idea is that you're vouching for a witness's credibility. That's indirect, I've asked. Judge Thomas, it's ‑‑ In other words, you say somebody is, let's take a classic snitch where somebody is under your subject to an agreement that makes you tell the truth or something like that. That's a different category. Yeah, although veracity is used typically for a specific, not so much as a character trait in the cases, but specifically with respect to the testimony in the case itself, whether, for instance, that cop lied a couple of witnesses ago, right? It would be almost impossible for the jury to separate out. I mean, think if Agent Ostergaard had said something inconsistent. It would have bore critically on the testimony of Agent Moritz. And so I see your distinction, but they're so overlapped in this case that it's hard for me to keep them apart. Your time has expired. Oh, sorry, Your Honor. Thank you. Thank you. May it please the Court, my name is Jim Morse, I'm the Assistant United States Attorney here on behalf of the government. Before addressing the defendant's various claims of error, I want to try and put the case in context. The evidence presented at this trial as to Mr. Carreno-Gutierrez was overwhelming. It wasn't just one incident of driving counter surveillance. The defendant was observed driving the person who actually delivered the drugs to the stash house where the drugs were obtained. He drove counter surveillance at that time. He then went into the house with five other people or with four other defendants to join Mr. Pitomoda who was inside the house. The house had an indicia of drugs, paraphernalia, guns inside of the house. He then left the house, got into different cars than they had arrived in. In other words, they changed up their driving arrangement. He was in a passenger with Felix Pitomoda. They then drove to the scene, and as they left, there was a counter surveillance, very odd driving behavior. It's set forth in my brief in some detail, but this was not just looking around. It was stopping, starting, passing, turning around, coming back. When he got to the place, to the scene of the deal and was ultimately arrested, they found guns and a cell phone, which is consistent with the cases that have said, this is what you need to argue that someone is involved in being the watcher for the drugs. Two loaded firearms for two people. Felix Pitomoda in the car also had a cell phone, so it was consistent with that. Afterwards, he did speak to a certified Spanish speaker and made a false denial, which the government argued very strongly during closing argument. It was strong indicia of his, or strong evidence of his guilt. The defendant denied going to the house at Granada Road, but didn't admit it until he was confronted. Then Agent Moritz, who, although not a certified Spanish speaker, laid proper foundation for his ability to speak Spanish, and that issue was not raised either in the briefs or in the district court. So I don't think there's anything there. So the evidence was overwhelming, but just as important, virtually none of the objections that are now raised in any of the briefs, except for Mr. Rivera Alvarado's, were presented to the trial judge. The issues that are being presented now, the sufficiency of the notice of experts, whether there was improper mixing of expert and fact witnesses, are all things that could have and should have been raised before the district court. I want you to assume for the purpose of this question that the mixing of the expert and fact witness in the same body was plain error, because this court has issued some opinions discussing that that can be problematic. Under plain error review, would you talk about whether that mixing caused a problem in this trial and the other? No. And as we set forth in our brief, Your Honor, the defendant did not point to any positions where this was particularly harmful to him. He cites to one place in the testimony where he talks about how this was a testimony, went back and forth and allowed the government to, you know, bolster the argument, so he was making a closing argument. But that was in the context of witness agent Meritz talking about how the deal was structured and why the government was trying to structure or why the agents were trying to structure it one way and why the defendant was trying to structure it a different way, Defendant Piedamoda. That's the type of evidence that both Freeman, Reed, and Martinez have all said, that's not plain error. That's not even error to allow it. The court, this court in Freeman, which predates this case and in the cases subsequent, said there is not a hard and fast rule. And for that reason, the government thinks those arguments that the defense raises with respect to the mixing of fact testimony do not rise to the level of plain error. I realize your question asked me to assume it. But let's even assume it is error. I'm not conceding that. It did not affect the fairness of this proceeding. The incidences that we laid out in our brief were isolated. Most of those were cases, or the points they cite to, like the counter-surveillance driving is the type of evidence that Freeman and Martinez and Reed say, yeah, you kind of have to do it that way, because the person who saw it is the only one who can tell agents what it was or can tell the jury what it was. The other testimony was very well handled in cross-examination by defense. The counterfeit money example given by the defendant was handled well by defense in cross-examination. As he acknowledges, there almost was no point to it. The weapons parts found in the home in cross-examination, that was ameliorated. There was nothing that, even if we assume error, and based upon your question, which I'm not conceding, that the error was somehow plain, it doesn't meet the other two requirements of a plain error reversal. That said, I don't want to hide behind plain error, because I don't believe that there was error in this regard with respect to the mixing. I'm not going to walk through all the examples, but the points or the examples that were cited to by defendants were isolated examples. They were not particularly prejudicial. They were the standard type of example that falls somewhere between, as this Court has recognized, real expert testimony and more law enforcement opinion testimony. And I don't think there's anything meriting reversal. And if there is any error, it's harmless. Do you want to talk about vouching? Do you want to talk about the vouching issue? It comes out of here, and it threw me off. I thought someone was talking over there. All right. Do you want to talk about the vouching? Yes, I would like to talk about the vouching. I do, because defense counsel, during his comments, said, you hear something often enough, the frog with wings, you believe it's true. He said as often as he can, both in his brief and in it, it's plainly vouching. It's not, Your Honor. None of the cases that he cites do. He cites, I believe, seven cases from this circuit and two from out of circuit as examples of plain vouching. None of them even come close to what was done in this case. No, perhaps not. But when you say you agree with this person's testimony, it does have the implication that you're endorsing it. Well, in the context of what was going on, she didn't say, do you necessarily agree. That might be a little further to the left, but I'm not going to concede that. She said, based upon your memory, was what Officer Moritz said what you remember. She was asking a fact question of this witness. Was his memory consistent with Officer Moritz's memory? There was no ---- The answer was a really odd answer. And that's my point. Even if we, and I'm not conceding this again, even if the court were to find that the question might be intended to elicit a vouching response, the response was not vouching. The defendant did not say, contrary to what defense counsel said, that it was absolutely correct. He said the context ---- You mean the witness, not the defendant. I'm sorry. The witness did not say that it was absolutely correct. He said the context was absolutely correct. And if you look at the question, she was talking about why it wasn't recorded, who was there, and what was asked. The witness did not give an answer that was a vouching answer, even if we were to assume the question was intended to deliver a vouching response. Turning back to the cases, all the cases, Smith, Kerr, Rudberg, all involved multiple examples of vouching, which is commenting on the veracity of a witness, commenting on the believability of a witness, or referring to facts not in evidence or to extrajudicial statements. In Rudberg, the defense or the prosecutor said if a witness commits perjury in the stand, it's my job to seek indictment on him if I can prove it, referring to allegations that one of the government witnesses might have lied. Other examples in the cases cited by defense deal with appealing to the court, the fact that the court accepted these plea agreements and these cooperators had to go before the court and tell the truth. None of them, none of the cases cited reached the level of an isolated question like this one. Defense tries to fault us also for pointing out we didn't even refer to this back in our closing argument. We didn't talk about you heard from three different witnesses that all said this was true. They just talked about Agent Moritz, or we just talked about Agent Moritz's testimony. We did not refer to back and say, and by the way, Agent Ostergaard said the same thing. It's because the question was asked in the context of the recording, and that's what the point was at the time, not what the content of the question was. Assuming that the severance issue has not been waived, what's your response on the merits? Your Honor, I think that the merits to the severance argument you mean on the 404B issue? No, I'm talking about the trial severance. Well, yes, and his argument should be that because of the 404B evidence it was so impermissibly over. I disagree completely with defense counsel that the instructions were not sufficient. He claims twice, once in his opening brief and again in his reply, that the final instructions did not tell the court or did tell the jury that they could only consider this as to the two witnesses. I'm going to read to you from, this is ER 220-221. You may consider the evidence, that evidence, and this is referring to the evidence from Felix Pitomoda, only as it bears upon the intent, plan, knowledge, or absence of mistake as it related to defendant Felix Pitomoda and for no other purpose. After he talked about some other acts of evidence for Jose Pitomoda, he then said, as to defendant Jose Jesus Rivera Alvarado, you may consider this evidence only, and there's some other stuff regarding his prior conviction, and then as the facts underlying the conviction bear on Jesus Rivera Alvarado's intent, plan, knowledge, or absence of mistake or accident as it related to the charges against him. The jury and also the government very carefully did not argue that evidence applied to anyone else and told the jury that they had to consider each individual separately. This is in our supplemental excerpt record at 337-38. It's also in Jose Pitomoda's excerpt of record at 399. And then the court also gave its standard instructions 310 and 314 at ER 219, which say you should consider evidence about the act, statement, intention of others, or evidence about other acts of the defendant only as they relate to each charge against each defendant. There was more than sufficient instructions in this case to make sure that there was no overlap and spill. The government did not argue any overlapping evidence, and more importantly, there was no objection to the evidence and no severance argument was raised. Your time has expired. Any further questions from the panel? All right. Thank you. So the case of United States v. Carino Gutierrez will be submitted.
judges: Schroeder, Thomas, Graber